GLICKSTEIN, Judge,
concurring specially.
We have affirmed the conviction of the defendant for the second degree murder and sexual battery of a three-year-old boy, Ronald Frost, Jr. The battery was by the defendant’s placing his finger in the sleeping child’s rectum to pick him up and take him to the bathroom.
The errors asserted by the defendant we have determined to be harmless. He complains it was harmful error to exclude testimony of a witness, notwithstanding violation of the rule of sequestration. We disagree. Unlike Wright v. State, 473 So.2d 1277, 1280 (Fla.1985), the excluded testimony concerns alleged mistreatment, in the past, of the child by the child’s mother. However, neither party’s case shows how that creates harmful error in the absence of further testimony of present involvement by the mother in the child’s death. All such excluded testimony shows is the grim and utter tragedy of the child’s life; it does not point, in any way, to the innocence of this defendant.
The defendant also complains that on redirect examination, the state was able to show the defendant had badly beaten a baby sitter at an earlier time. It was error to allow the state to introduce such on redirect as a reply to cross-examination of the baby sitter which indicated the defendant’s previous, passive behavior towards children. However, the evidence did not become a feature; and the evidence of the child’s death was graphically brutal, having been caused by blunt head injury, shaken infant syndrome, anoxic injury and hemorrhaging within the brain.
There are other, although not “life threatening,” injuries to the child revealed by the autopsy including subdural hemato-ma and fracture of the frontal bone of the skull.
While the defendant contends his defense was that the child’s mother, Rachael Frost, killed the child, the mother invoked the Fifth Amendment when called as a witness and the testimony — at least in this trial— does not point in her direction. What would be produced in any charge against her as to her involvement on the night in question after returning home from work after 2:00 a.m. is not before us.
On June 23,1986, paramedics were called to apartment four at 1311 Northeast Third Avenue, Ft. Lauderdale, Florida at roughly 10:01 a.m. When they arrived at the residence, appellant directed them to the apartment where they found Ronald in cardiac arrest. The child had bruises on his face, neck and upper chest, and around his eyes indicating head injuries. There was also a bite mark on the child’s right cheek.
Appellant told paramedics that he was baby-sitting while the child’s mother was at work. When asked how the child got the facial bruises, appellant responded that he had tripped over the child when he went to the bathroom during the night. The child was ultimately taken to the hospital, where he died.
Appellant was taken to the police station where he gave a taped statement to Detective Blackburn of the City of Ft. Lauder-dale Police Department. Initially, appellant said he stepped on the child’s back when appellant went into the child’s room at 3:00 a.m. to close the windows due to a draft. Detective Blackburn testified that Blackburn then left the room to call the hospital and inform them of the possibility of internal abdominal injuries to the child. Blackburn testified that when he returned, he questioned appellant about injuries Blackburn had observed on the back and rectum of the child.
Appellant said that at 11:00 p.m. the night before, appellant awakened Ronnie to take him to the bathroom because of a bed-wetting problem. At that time, the child was sleeping on his stomach. Appellant stated that he placed his finger in the child’s rectum to pick him up and take him to the bathroom. Appellant told Blackburn that he took the child into the bathroom and placed him on the commode. Appellant also told Blackburn that appellant left the bathroom for a moment, heard a thump, and returned to the bathroom to find the child lying on the floor.
*849 Michelle Bishop, who lived in a neighboring apartment, testified that Rachael Frost lived with appellant, who was Frost’s boyfriend, and Frost’s three children. On the night of June 22 and the morning of June 23, Bishop testified that she heard several loud noises which shook the wall between her apartment and appellant’s between 1:00 and 1:45 a.m. Bishop also testified that the noises were in the area of appellant’s bathroom. Bishop testified that she saw Rachael Frost leave for work with Barbara Rae, but did not know what time Frost returned home. Another witness put the return home time as close to 3:00 a.m.
Richard Brilles, who lived with Barbara Rae in June of 1986, also testified as to the events of June 22 and 23. According to Brilles, appellant knocked on his door at 9:50 a.m. on June 23, saying that Ronnie wasn’t breathing and asking Brilles to come take a look at the child. Brilles said he told appellant, “Now you really did it,” but appellant said nothing. Brilles testified that when he saw Ronnie the child’s left cheek was black and blue. The child also had teeth marks on the right cheek.
Brilles testified that appellant said that the bruises had occurred when Ronnie fell off the toilet and hit the floor or the bathtub or something. When Brilles asked about the bite mark, appellant said nothing.